CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUL 1 1 2013

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| RITA M. LINDSEY, | ) | Civil Action No. 7:12cv00508 |
| Plaintiff, | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| ALLIANT TECHSYSTEMS INC. and ALLIANT TECHSYSTEMS OPERATIONS, LLC, | ) ) ) | |
| Defendants. | ) ) | By: Samuel G. Wilson United States District Judge |

Plaintiff Rita M. Lindsey brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"), alleging that the defendants, Alliant Techsystems Inc. and Alliant Techsystems Operations, LLC (collectively, "Alliant") discriminated against her based on her sex and age, subjected her to a hostile work environment, and retaliated against her for complaining about her working conditions. In 2011, after two of Lindsey's coworkers lodged official complaints about Lindsey's conduct at work, Alliant conducted an investigation and concluded that she had violated the company's policy related to workplace behavior. Alliant told Lindsey that it intended to transfer her to another department. Lindsey refused the transfer, and she either quit or was fired. In Lindsey's view, Alliant acted out of discriminatory animus and in retaliation for her previous complaints. Alliant has moved for summary judgment on all of Lindsey's claims, offering the sworn testimony of more than a dozen of Lindsey's coworkers and supervisors, all of whom attest that Lindsey's version of events oscillates between fictitious and inaccurate. Despite the differing versions of events, the court finds no genuine dispute for trial on Lindsey's sex discrimination, age discrimination, and retaliation claims because she offers no

proof that Alliant's proffered reason for taking action against her was anything but legitimate and nondiscriminatory. The court finds, however, that a reasonable juror who believed Lindsey's version of events could find that she was subject to a hostile work environment. Accordingly, the court grants Alliant's motion for summary judgment in part and denies it in part.

I.

These facts are undisputed: Lindsey began working for Alliant at the Radford Army Ammunition Plant in 1996. Starting in 2003, Lindsey worked as a "Ballistics Technician." In July of 2009, Alliant installed Neil Miller as Lindsey's immediate supervisor. On February 22, 2011, two Alliant employees called Alliant's ethics hotline and made separate complaints about Lindsey. Sharon Kitchner reported that Lindsey had been "creat[ing] a hostile working environment . . . by spreading false stories and rumors." Ex. V 1, ECF No. 17-22. Kitchner alleged that several of Lindsey's coworkers would not speak to Lindsey because she had spread rumors about them, and that Lindsey's coworkers felt she was unstable and were "afraid to work with her." Id. The second complaint, placed anonymously but later revealed to be from Eric Woodrum, echoed the first. It claimed that Lindsey "start[ed] trouble," "spread[] rumors," and "plot[ted] against co-workers." Ex. W 1, ECF No. 17-23. According to Woodrum, Lindsey's coworkers were reluctant to be alone with her for fear that she would "fabricate an incident" and report it to human resources. Id.

Alliant suspended Lindsey with pay and started an investigation into Kitchner's complaint (but not Woodrum's anonymous complaint). One of Alliant's human resources "generalists," Jeffrey Hamley, headed the investigation. Hamley interviewed eight of Lindsey's coworkers, and took notes on the interviews. According to those notes, all of Lindsey's coworkers made disparaging statements about her during their interviews. For example: "she

turns people against each other." Ex. Z 1, ECF No. 17-26. "Things are a lot better [with Lindsey on suspension]." Id. at 3. "She gets angry." Id. "I have worked with her for 3 years and it has gotten worse." Id. at 4. "The biggest problem is she keeps things stirred up." Id. "She will be all in your face—and the next she will be your friend." Id. at 6. "I do not think she would commit[] an act of aggression but she would lie or tell stories about me." Id. at 8. "I am afraid of being alone in a room w[ith] her. She seems like she likes to make stuff up." Id. at 9. "She yells at you." Id. at 10. "She was moved out of [another department] about two years ago because she was causing problems." Id. at 12. "I try to avoid her." Id. "She would be best to work in a place where she does not come in contact w[ith] people." Id. "I never had to go in front of H.R. in 33 years except 2–3 times and it always involves her." Id. at 13. "I wish she would take a swing at me. It would be better than the way she talks to you." Id. at 14.

Based on those interviews, Hamley completed an investigation report. The report summarized his interviews and concluded that Lindsey had violated Alliant's code of conduct as it related to "workplace respect and behavior." Ex. AA 1, ECF No. 17-27. Hamley recommended that Alliant "[m]ove Lindsey to an area where she works by herself. Notify her that she is on a last chance. Reinforce the fact that this is the second time she has been moved for failure to get along with coworkers. There will not be a third time." Id. Carl Willis, Vice President of Human Resources, and Denise Hughes, Human Resources Director, approved Hamley's recommendation.[1] Soon after, Charles Snedeker, a human resources representative, met with Lindsey and Joel Geiss, Lindsey's union representative, to discuss the investigation. Snedeker told Lindsey that she had violated Alliant's code of conduct and that Alliant intended to reassign her to another position. Snedeker presented Lindsey with a "Memorandum of

---

[1] The parties dispute the specifics and relative timing of Willis' and Hughes' involvement in the approval process, but it is clear from the record that both Willis and Hughes took *some* part in approving Hamley's recommendation.

3

Agreement" that made her continued employment contingent on her agreement that Alliant would reassign her and require a drug test prior to resuming work. The agreement further explained that Alliant would terminate Lindsey should she again fail to comply with Alliant's code of conduct. Geiss told Lindsey that she should sign the agreement and could grieve Alliant's decision so that the union could pursue the grievance. Lindsey Dep. 46–47, ECF No. 17-1. Nevertheless, Lindsey refused to sign the agreement, left the meeting, and did not return for work. She was fifty years old.

Lindsey and Alliant do not agree on much else. This is Lindsey's version of events: Things took a turn for the worse at Alliant after Neil Miller became Lindsey's supervisor in 2009. On Miller's first day, Lindsey addressed a question to her former supervisor, and Miller "exploded in anger," and with "the veins in his face and neck . . . pulsing," screamed at Lindsey that questions should be addressed to him because he was now the supervisor. Compl. 4, ECF 1. After the incident, Lindsey's former supervisor "forced Mr. Miller to apologize to Ms. Lindsey. Id. Miller often spoke to Lindsey in this sort of "aggressive and disrespectful manner," and he subjected her to "sexually based and age-related stories/jokes in the workplace." Id. at 4–5. Once, "Miller forced Ms. Lindsey to listen to a distasteful story he was telling to several male employees about marital infidelity." Id. at 5. Miller often asked another female employee if she "wanted to 'go play with Dick'" (referring to an Alliant worker named Richard), and once laughed when an employee made a joke about bringing a sex toy to work. Id. And "Ms. Lindsey was subjected to co-workers discussing 'sexting' and discussing the size of their children's penises." Id. at 6.

On one occasion, an Alliant employee found a box filled with incontinence pads and female hygiene products concealed near a former employee's work station. After a group of

male employees formed and started looking through the box, Miller summoned Lindsey over to the group. Miller asked Lindsey what the items "were and why they were there." Id. at 6. Several members of the group "made references to the feminine products and this former employee's old age and joked, 'she is so old when she coughs she probably wets herself!'" Id. Lindsey's coworkers "laughed raucously" until she walked away. Id. at 6.

Miller favored employees by "covering up their mistakes, providing them with fast-tracked promotions, and submitting them to very little oversight" if they were willing to participate in his jokes and banter. Id. at 7. Lindsey, by contrast, was "alienated and treated poorly." Id. Often, while Lindsey was on her scheduled breaks, Miller would tell her to "get back to work." Id. at 8. Although Lindsey consistently worked overtime and on the weekends and was "good at her job," Miller made disparaging comments like, "We didn't get that done this weekend. All we had this weekend was [*Lindsey*]." Id. at 7. Once, Lindsey and another coworker were tasked with testing certain ammunition rounds. Because the pair worked so efficiently, Miller's supervisor told him to give Lindsey and her coworker an award. Instead, Miller "belittle[d] Ms. Lindsey in front of a group of employees." Id. at 8. Lindsey's coworker did not get the same harsh treatment, and Lindsey did not get her award. Miller often singled Lindsey out in this way. He once "screamed at" Lindsey for using the wrong ammunition shells during a gunpowder test, and told her that he was going to "write her up." Id. When engineers later confirmed Lindsey's choice of procedures, "Miller was forced to abandon" any disciplinary action. Id. at 9. On another occasion, Miller failed to give Lindsey a critical test setting for an ammunition test, and the test failed. Miller eventually admitted his mistake.

Miller was not Lindsey's only problem—her coworkers also treated her poorly. During a conversation about job security, coworker Chris Back told Lindsey, "At your age you don't need

the money." Id. at 10. Back added, "You are as lazy as my wife," and, "As long as you have been here, you should know more." Id. Lindsey also overheard Back tell his male coworkers, "The women talk too much," and "[t]hey . . . can't do the work without me." Id. In another example, Eric Woodrum "falsely accused Ms. Lindsey of not completing her work in a timely manner." Id. at 11. When Lindsey confronted Woodrum about the matter, he "physically rushed at her in an intimidating fashion effectively pushing her aside in the hallway." Id. Lindsey complained about the incident to Miller, Snedeker, and to Technical Department Director Andrew Sanderson. After Lindsey complained to her union representative about another matter, Miller made Lindsey move boxes for eight hours outside in the cold. And Lindsey lodged complaints about the workplace with area manager Russ Miller in September of 2009, Alliant's Director of Human Resources Denise Hughes in February of 2010, and supervisor Miller in November of 2010, all with no result.[2]

Alliant's version of events differs markedly. Alliant offers a number of declarations and copious deposition testimony from Lindsey's coworkers, in which they all claim that Miller never yelled at, cursed at, or belittled Lindsey, and never told or tolerated inappropriate sexist jokes. Lindsey's female coworkers swear that the work environment at Alliant is not hostile. One of them characterized Miller as "the most understanding supervisor" she has had in twenty-three years at Alliant. Ex. F, 1, 2, ECF No. 17-6. Lindsey's coworkers likewise deny that Miller screamed at her on his first day as a supervisor, and Lindsey's former supervisor swears he never told Miller to apologize to Lindsey for any such incident. According to Alliant's employees,

---

[2] According to Lindsey, the incidents in the complaint are the only incidents on which she bases her claims. See Lindsey Dep. 210, ECF No. 17-1 ("Q. All right. And you understand that we have talked about a number of incidents that you make, what I think you have acknowledged to be every specific instance that you can identify of inappropriate either conduct by others in the workplace or discrimination directed at you or harassment, you have described all those in the complaint, we have talked about them today, correct? A. Yes."). In her deposition testimony, Lindsey expands on each event.

Miller never said "go play with Dick." Compl. 5, ECF No. 1. Lindsey's coworkers swear that the incident with the hygiene products simply never occurred, that Miller did not scream at Lindsey about using the wrong ammunition shells during a gunpowder test, and that Miller never threatened to "write her up." Id. at 8. Miller says he never failed to give Lindsey proper equipment settings and that it would not be possible for him to do so. Alliant claims that Miller never disciplined Lindsey in any way and that Lindsey never lodged complaints about the incidents she now recounts. Essentially, if Lindsey claims that something inappropriate happened, Alliant and its employees claim that it did not happen or did not happen as Lindsey describes.

## II.

Lindsey contends that Alliant is liable for sex discrimination under Title VII because it "wrongfully terminat[ed]" her.[3] Compl. 13, ECF No. 1. Alliant argues that summary judgment is appropriate because Lindsey offers no proof from which a jury could find sex discrimination; fails to establish a prima facie case under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); and fails to show that Alliant's reason for taking action against Lindsey was pretext for sex discrimination. The court agrees with Alliant and grants it motion for summary judgment on Lindsey's sex discrimination claim.

---

[3] The court notes that Alliant and Lindsey disagree about whether she quit or whether Alliant fired her. For the purposes of this opinion, the court assumes that Alliant's decision to transfer Lindsey (which is undisputed) is sufficiently "adverse" to sustain a claim for Title VII discrimination. See, e.g., Eady v. Veolia Transp. Servs., Inc., 609 F. Supp. 2d 540, 554 (D.S.C. 2009) ("To show a violation of Title VII, 'a plaintiff must establish that an adverse employment action has occurred.'" (quoting Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985))).
In addition to claiming wrongful termination, Lindsey has suggested that Alliant is liable for sex discrimination because it "permitt[ed] a work environment that was sexually charged and discriminatory to Ms. Lindsey and other women." Compl. 13, ECF No. 1. In the court's view, that particular allegation fits properly under Lindsey's hostile work environment claim. In any event, Lindsey does not appear to actually argue the point.

7

Title VII makes it unlawful for an employer to "discharge any individual or otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e–2(a)(1). In the usual analysis of Title VII sex discrimination claims, courts consider whether the plaintiff has offered sufficient direct or indirect evidence of discrimination. Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996); see also id. (referring to "ordinary principles of proof"). Such evidence is sufficient to survive summary judgment if it clearly indicates a discriminatory attitude at the workplace and if the plaintiff illustrates a nexus between that attitude and the employment action. See Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 520 (4th Cir. 2006) (citing Brinkley v. Harbour Recreation Club, 180 F.3d 598, 608 (4th Cir. 1999)). In the absence of direct or indirect evidence, courts apply the familiar burden-shifting framework the Supreme Court articulated in McDonnell Douglas Corp. v. Green and subsequent cases. Under this framework, the plaintiff must establish a prima facie case of sex discrimination by showing (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) that similarly situated employees outside the protected class received more favorable treatment. Gerner v. Cnty. of Chesterfield, 674 F.3d 264, 266 (4th Cir. 2012). If the plaintiff makes a prima facie showing, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action. Bonds v. Leavitt, 629 F.3d 369, 386 (4th Cir. 2011). If the employer articulates such a reason, the burden returns to the plaintiff to establish that the employer's stated reason was actually a pretext for discrimination. Id.

Here, Lindsey's sex discrimination claim fails under either method of proof. In terms of "ordinary" proof, Lindsey offers a constellation of events as proof of a discriminatory attitude: Miller's stories about infidelity, the break-room jokes, the hoopla surrounding the box of hygiene

products, and so on.[4] But even given the generous assumption that those events viewed in the aggregate indicate an actual discriminatory attitude at Alliant, Lindsey makes no serious attempt to illustrate a nexus between those events and Alliant's employment decision. Consequently, Lindsey has not met her burden under "ordinary principles of proof." Evans, 80 F.3d at 959.

Lindsey likewise fails to meet her burden under the McDonnell Douglas framework. Prima facie case aside, Alliant has offered a legitimate, nondiscriminatory reason for deciding to transfer Lindsey: her violation of Alliant's code of conduct. In an effort to undermine Alliant's justification for its decision, Lindsey points out that Snedeker, Hamley, and Hughes, at various times during their depositions, could not offer sufficiently specific examples in response to counsel's various specific questions regarding Lindsey's behavior at work. She further claims that there is a "question of fact" relating to whether Alliant allowed Lindsey to participate in the investigation.[5] Essentially, Lindsey invites the court to wade into the innards of Alliant's investigation and determine whether specific facts and procedures supported its outcome. But, "[o]nce an employer has provided a non-discriminatory explanation for its decision, the plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it." Hux v. City of Newport News, 451 F.3d 311, 315 (4th Cir. 2006). It is not the court's "province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the

---

[4] Lindsey also points out that Miller once pulled Kitchner aside to "discuss her production," and Kitchner told Miller that he was a sexist. Kitchner Dep. 12, ECF No. 20-1. But, according to Kitchner's deposition testimony, her statement to Miller was not true, Miller is not a sexist, and she made the statement merely "[b]ecause [she] was upset about him pulling [her] aside and fussing at [her] about the work." Id. at 13.

[5] In addition, Lindsey expends nearly thirteen pages of her brief arguing that Kitchner's and Woodrum's complaints against her lacked a sufficient "factual basis" because those employees during their depositions could not cite specific examples of Lindsey's bad behavior at the workplace. In other words, Lindsey attempts to establish that her *coworkers' complaints to human resources* were pretextual. That, of course, is not what McDonnell Douglas demands—it demands a showing that the *employer's* proffered reason for its action was a pretext for sex discrimination.

9

reason for the plaintiff's termination." DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir. 1998) (quoting Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 411 (4th Cir. 1997)). Lindsey's disagreement with the mechanics of the investigation and its outcome does nothing to establish that Alliant's reason was *actually a pretext for sex discrimination.* Alliant has proffered its reason and buttressed it with an investigation report, investigative notes, and the original employee complaints. Those who played a part in making the decision (Hamley, Hughes, and Willis) took no part in the day-to-day events on which Lindsey grounds her claim.[6] Accordingly, the court finds that Lindsey has failed to establish a genuine dispute for trial and grants Alliant's motion for summary judgment on Lindsey's sex discrimination claim.

### III.

Lindsey claims that Alliant is liable for age discrimination under the ADEA because it "would not have terminated [her] or taken other discriminatory action[7] against [her] but for [her] age." Compl. 15, ECF No. 1. As with Lindsey's claim for sex discrimination, Alliant argues that summary judgment is appropriate because Lindsey offers no proof from which a jury could find age discrimination and fails to rebut Alliant's legitimate reason for its action. The court agrees with Alliant and grants it motion for summary judgment on Lindsey's age discrimination claim.

The ADEA prohibits employers from discriminating against an employee based on her age. 29 U.S.C. § 623(a). As with a sex discrimination claim under Title VII, a plaintiff can avert

---

[6] An employer cannot "insulate itself from discrimination on the part of a supervisor and dominant decision-maker through the use of a formal decisionmaker who merely rubber-stamped or acted as a cat's paw for the supervisor's decision." Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 290 (4th Cir. 2004) (en banc). Here, there is no indication that Miller played any role at all in Alliant's decision (save for the fact that Miller was one of a number employees that Hamley interviewed), much less that Hamley, Hughes, and Willis "rubber stamped" some decision by Miller.

[7] Lindsey refers to "other discriminatory action," but does not clarify her reference.

summary judgment on an ADEA claim by offering evidence of unlawful discrimination under "ordinary principles of proof" using direct or indirect evidence. Burns v. AAF–McQuay, Inc., 96 F.3d 728, 731 (4th Cir. 1996). To avoid summary judgment when proceeding under ordinary principles of proof, "the plaintiff must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact." Rhoads v. FDIC, 257 F.3d 373, 391 (4th Cir. 2001) (alteration in original) (quoting Brinkley, 180 F.3d at 607) (internal quotation marks omitted). "What is required is evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." Id. (quoting Brinkley, 180 F.3d at 607) (internal quotation marks omitted).

A plaintiff lacking that sort of proof may proceed under the McDonnell Douglas proof scheme. See Moody v. Arc of Howard Cnty., Inc., No. 11–1720, 2012 WL 1184053, at *2 (4th Cir. April 10, 2012).[8] Under the ADEA's version of the McDonnell Douglas proof scheme, the plaintiff establishes a prima facie case of discrimination by showing that she was (1) forty years of age or older when (2) her employer terminated her, that (3) she was performing her duties at a level that met her employer's legitimate expectations, and that (4) her former position remained open or was filled by a substantially younger person. Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en banc); see also Dugan v. Albemarle Cnty. Sch. Bd., 293 F.3d 716, 721 (4th Cir. 2002) ("[T]he fourth element is satisfied with proof of replacement

---

[8] In Gross v. FBL Financial Services, 557 U.S. 167 (2009), which held that the ADEA does not authorize mixed-motive discrimination claims and that plaintiffs must prove by a preponderance of the evidence that age was the "but for" cause of the challenged employer decision, Justice Thomas (the opinion's author) pointed out that the Supreme Court has not affirmatively decided whether the McDonnell Douglas framework applies to ADEA claims. Since Gross, however, courts outside this circuit have held that the McDonnell Douglas framework is still appropriate. See, e.g., Yeschick v. Mineta, 675 F.3d 622, 632 (6th Cir. 2012). The Fourth Circuit has not so held, but in fact routinely applied McDonnell Douglas to ADEA claims before Gross, see, e.g., Laber v. Harvey, 438 F.3d 404, 430 (4th Cir. 2006), and has since applied McDonnell Douglas to ADEA claims in unpublished decisions, see, e.g., Moody, 2012 WL 1184053, at *2.

11

by a substantially younger worker—not proof of replacement by someone entirely outside the ADEA's protected class."). A burden of production then shifts to the employer to offer a nondiscriminatory reason for terminating the plaintiff. Hill, 354 F.3d at 285. And, if the employer meets its burden, a burden of proof returns to the plaintiff to prove that the employer's stated reasons were not its true reasons, but a pretext for age discrimination. Id.

Here again, Lindsey makes no serious attempt at using ordinary proof to establish her claim. Rather, she offers one temporally removed instance of apparent ageism—the incident involving the box of hygiene products—and offers nothing to show that the event was connected to Alliant's employment decision. And, assuming that Lindsey has established a McDonnell Douglas prima facie case, she has not met her burden of rebutting Alliant's proffered nondiscriminatory reason for taking action against her. Lindsey's efforts in this regard are indistinct from her efforts to establish Alliant's proffered reason as pretext for sex discrimination, and her efforts here are no more successful than they were there. Accordingly, the court grants Alliant's motion for summary judgment on Lindsey's ADEA claim.

## IV.

Lindsey claims that she "made complaints about the work environment and was subsequently targeted and ultimately wrongfully terminated" in retaliation for her complaints. Alliant argues that Lindsey has no proof that she ever complained to Alliant management about her working conditions, nor any proof that Alliant's decision to transfer her was in retaliation for those alleged complaints. The court agrees with Alliant as to the latter argument and grants its motion for summary judgment on Lindsey's retaliation claim.

Employers are prohibited from retaliating against employees because of an employee's participation in a "protected activity." See Laber v. Harvey, 438 F.3d 404, 432 (4th Cir. 2006).

In the absence of ordinary proof of retaliation, and as with claims of sex and age discrimination, courts apply the McDonnell Douglas framework. Id. "To establish a prima facie case of retaliation, a plaintiff must demonstrate that: (1) [s]he engaged in protected activity; (2) an adverse employment action was taken against [her]; and (3) there was a causal link between the protected activity and the adverse action. Id.; see also Laing v. Fed. Express Corp., 703 F.3d 713, 720 (4th Cir. 2013). Protected activities include "'voicing one's own opinions in order to bring attention to an employer's discriminatory activities,' as well as 'complain[ts] . . . about suspected violations.'" EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 406 (4th Cir. 2005) (alterations in original) (quoting Bryant v. Aiken Reg'l Med. Ctrs., Inc., 333 F.3d 536, 543–44 (4th Cir. 2003)). The Supreme Court holds that an "adverse employment action" must be "materially adverse." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006). That is, "the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." Id. If the plaintiff establishes a prima facie case, the court applies "the remainder of the McDonnell Douglas test— whether the employer has produced a legitimate, non-discriminatory reason" for its action, and "if so, whether the employee can show that the reason is false, and, ultimately, that the employer retaliated against him." Id.

Here, as with Lindsey's other claims, the parties vehemently dispute the underlying facts. Lindsey claims that she complained early and often about her working conditions. On the other side of the dispute, none of the Alliant employees to whom Lindsey claims to have complained remember Lindsey lodging those complaints. In fact, only one of Lindsey's alleged complaints has factual substantiation beyond her own sworn deposition testimony.[9] The parties likewise

---

[9] According to Snedeker, Lindsey called him and asked whether Miller had reported that Lindsey had been sleeping in the break room. When Snedeker answered "no," Lindsey mentioned that Miller often yelled and used

13

disagree on whether Alliant terminated Lindsey, whether she quit, or whether the decision to transfer her constitutes a constructive discharge.[10] Neither the court nor a jury need resolve those disputes because there is no dispute on this critical issue: Lindsey has failed to offer any evidence that Alliant's proffered reason for its action was pretext for retaliation. In fact, Lindsey makes no argument whatsoever that Alliant's proffered reason was pretext for retaliation. Instead, she ends her argument after concluding that "[i]t is therefore clear that Ms. Lindsey has proven a *prima facie* case of retaliation." Resp. 47, ECF No. 18. Discerning no genuine dispute regarding Alliant's proffered justification for its action, the court grants Alliant's motion for summary judgment on Lindsey's retaliation claim.[11]

## V.

Lindsey claims that Alliant is liable for creating a hostile work environment in violation of Title VII because she was "subject to unwelcome sexual innuendos and remarks based upon her sex that altered the conditions of her employment and created an abusive work environment."

---

offensive language in the workplace. Snedeker conducted an informal investigation in which he asked "six or seven" of Miller's supervisees whether Miller yelled or used offensive language in the workplace, and "[e]very single person said no to all of it." Snedeker Dep. 26, ECF No. 17-19.

[10] "Constructive discharge, like any other discharge, is an adverse employment action that will support an action for unlawful retaliation." West v. Marion Merrell Dow, Inc., 54 F.3d 493, 497 (8th Cir. 1995).

[11] It is clear that Lindsey believes Alliant decided to transfer her in retaliation for her alleged complaints, but Lindsey is vague about what other specific conduct she believes was retaliatory. It is, of course, not the court's task to scour the record in search of potentially unlawful retaliatory conduct. Two incidents do bear mentioning, however. First, Lindsey claims that the day after she lodged a complaint about Alliant with her union representative, "Mr. Miller punished Ms. Lindsey by forcing her to move boxes for eight (8) hours outside in the extreme cold." Compl. 11, ECF No. 1. According to Lindsey's own deposition, however, Alliant's ballistics department was on furlough at the time due to a water-main break. When Lindsey called her Union and asked for work, Miller put her to work—right alongside himself—moving boxes out of an unheated warehouse. In her brief in opposition to Alliant's motion for summary judgment, Lindsey does not attempt to explain how asking for work, and then being put to work alongside a supervisor, satisfies the elements of a retaliation claim. See Laber, 438 F.3d at 432 (explaining the elements of a retaliation claim); see also Burlington N. & Santa Fe Ry., 548 U.S. at 57 (explaining that an "adverse employment action" must be "materially adverse," that is, it must "be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination"). Second, Lindsey points out that her promotion from "Ballistics Trainee" to "Ballistics Technician A" took months longer than other employees. She does not dispute, however, that the requirements for such a promotion were lessened after she earned her rating. See Mot. Summ. J. 11, ECF No. 17.

14

Compl. 14, ECF No. 1. Alliant makes three arguments in support of its motion for summary judgment. First, Alliant argues that Lindsey has not established a prima facie case because she offers no evidence that the alleged harassment was "because of" her sex. Second, Alliant argues that the alleged harassment was insufficiently "severe and pervasive" to establish a prima facie case. Third, Alliant argues that it is protected by the Faragher-Ellerth affirmative defense applicable to supervisory harassment. In the face of clear precedent, the court rejects those arguments and denies Alliant's motion for summary judgment on Lindsey's hostile work environment claim.

Because "an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action." EEOC v. R & R Ventures, 244 F.3d 334, 338 (4th Cir. 2001). To establish a hostile work environment based on sex, a plaintiff-employee "must show that the offending conduct (1) was unwelcome, (2) was because of her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer." Hoyle v. Freightliner, LLC, 650 F.3d 321, 331 (4th Cir. 2011).

In Hoyle, the Fourth Circuit Court of Appeals confronted a case in which the district court had granted summary judgment in favor of an employer after finding that the plaintiff, a truck-assembly worker, had failed to demonstrate that objectionable workplace conduct was "because of" her sex, or that it was sufficiently severe and pervasive to alter the conditions of her employment. The plaintiff's coworkers had tied a tampon to a key ring and left it in the plaintiff's work area, put photos of scantily clad women on their own toolboxes and a company computer, and left swimsuit calendars in various locations at the workplace. In reaching its decision, the Court of Appeals explained that an "employee is harassed or otherwise

15

discriminated against 'because of' his or her gender if, 'but for' the employee's gender, he or she would not have been the victim of the discrimination." Id. (quoting Smith v. First Union Nat'l Bank, 202 F.3d 234, 242 (4th Cir. 2000)). The Hoyle court further explained that the severe-and-pervasive element is "quintessentially a question of fact" because it is measured both from the plaintiff's point of view, and from the perspective of "a reasonable person in the plaintiff's position, considering 'all the circumstances.'" Id. "[T]he totality of the circumstances," noted the court, "includes conduct directed not at the plaintiff." Id.

The Court of Appeals vacated the district court's grant of summary judgment, holding that a "juror could reasonably find that sexualizing the work environment by placing photos of nude women or women in sexually provocative dress and poses in common areas is detrimental to female employees and satisfies the 'because of sex' requirement." Id. at 331–32. The court further found that "a reasonable juror could reasonably find that, taken together, the various incidents and displays 'that consistently painted women in a sexually subservient and demeaning light were sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and to create an abusive work environment.'" Id. at 333 (alteration in original) (quoting Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 333 (4th Cir. 2003)) (quotation marks omitted).

With that guidance in mind, the court turns to Lindsey's hostile work environment claim. Depending on how generously one reads Lindsey's version of events, she has recounted approximately twenty incidents that form the basis of her claims. Of those, a dozen or more have no hint of "sex-specific and derogatory terms." Id. at 331. But the balance consists of tasteless, sexualized jokes and conversations that Lindsey overheard, and one arguably sex-related incident directed at Lindsey (the incident with the hygiene products). Based on those incidents, a reasonable juror could find that "sexualizing the work environment" by joking about

"sexting", sex toys, infidelity, and "play[ing] with Dick," satisfies the "because of sex" requirement. Id. at 331–32. Likewise, a "reasonable juror could reasonably find that, taken together, the various incidents . . . were sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and to create an abusive work environment." Id. at 333 (alteration in original) (quoting Ocheltree, 335 F.3d at 333) (quotation marks omitted). It is not the court's job to "weigh the evidence . . . or to disregard stories that seem hard to believe. Those tasks are for the jury." Gray v. Spillman, 925 F.2d 90, 95 (4th Cir. 1991). The Fourth Circuit has "never held that a weak case is necessarily one that should be disposed of on summary judgment." Hoyle, 650 F.3d at 334.

    Alliant claims that it is entitled to the benefit of the Faragher-Ellerth affirmative defense. The court finds that questions of fact forestall the defense at this stage of the proceedings. While "an employer is directly liable for an employee's unlawful harassment if the employer was negligent with respect to the offensive behavior," "different rules apply" when the harassment originates with a supervisor. Vance v. Ball State Univ., ---S. Ct.---, 2013 WL 3155228, at *5 (2013). The first of those rules is that an employer is strictly liable for the harassment of a supervisor "when [the] supervisor takes a tangible employment action." Id. (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 762 (1998)). The second rule is that harassment *not* culminating in a tangible employment action allows the employer to "mitigate or avoid liability by showing (1) that it exercised reasonable care to prevent and promptly correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities that were provided." Id. at *6 (citing Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998)). That is, the employer can assert the Faragher-Ellerth affirmative defense.

17

"Under Ellerth and Faragher, it is obviously important whether an alleged harasser is a 'supervisor' or merely a co-worker . . . ." Id. at *7. An employee is a "supervisor" if he is empowered "to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Id. (quoting Ellerth, 524 U.S. at 761). Here, on this record, there is a question of fact as to whether Alliant vested Miller with that sort of supervisory power. There is, in addition, a question of fact as to whether Lindsey "unreasonably failed to take advantage of any preventive or corrective opportunities that [Alliant] provided." Id. at *6. While Alliant claims that Lindsey did not take advantage of its formal harassment reporting procedures, Lindsey claims she complained to a number of people, including human resources professionals, without result. In light of that dispute, whether Lindsey "unreasonably" failed to take advantage of Alliant's formal reporting procedures is not a question the court can resolve at this stage. Accordingly, the court denies Alliant's motion for summary judgment on Lindsey's hostile work environment claim.

## VI.

For the reasons stated, the court grants Alliant's motion for summary judgment on Lindsey's sex discrimination claim, her age discrimination claim, and her retaliation claim.[12]

---

[12] Lindsey has filed a motion to strike seven of the sworn declarations that Alliant has offered in support of its motion for summary judgment. Those declarations, all from Lindsey's coworkers, recite a number of fairly specific examples of Lindsey's workplace conduct. For instance, Randy Bailey offers that "Lindsey's mood would change dramatically from day to day. She would wait until you were alone and then she would let you have it." Ex. I 2, ECF No. 17-9. According to Mark Wheaton, "At one point or another, . . . Lindsey had gone after or caused trouble for everyone working in the medium caliber range. Pretty much everybody in the medium caliber range could not get along with her." Ex. H 2, ECF No. 17-8.
  Lindsey argues that the court should strike the declarations pursuant to Federal Rule of Civil Procedure 37(c) because Alliant "failed [during discovery] to provide any of the factual support for Ms. Lindsey's termination now found in the Declarations supporting Defendants' Motion for summary judgment." Mot. 2, ECF No. 19. Alliant argues that Lindsey's motion is a "blatant attempt" to strike damaging facts. Reply 2, ECF No. 21. The court need not address the merits of the parties' arguments because the court does not rely on the employees' declarations in reaching its judgment. Whether the court grants the motion or not, there remains a vigorous dispute over the character of Lindsey's interactions with her coworkers. The court does not resolve those disputes here, and

The court denies Alliant's motion for summary judgment on Lindsey's hostile work environment claim.

**ENTER**: July 10, 2013.

                                                    UNITED STATES DISTRICT JUDGE

---

instead bases its decision on the lack of any evidence that Alliant's decision makers harbored sex- or age-based animus, or any retaliatory motive. Consequently, the court denies the motion as immaterial.